**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JANE DOE,**<br>**c/o Smithey Law Group, LLC**<br>**706 Giddings Avenue, Ste. 200**<br>**Annapolis, Maryland 21401**<br><br>***Plaintiff*,**<br><br>**v.**<br><br>**JOHNS HOPKINS UNIVERSITY,**<br>**3400 N. Charles Street**<br>**113 Garland Hall**<br>**Baltimore, MD 21218,**<br><br>**Serve: Tiffany Wright, General Counsel**<br>**3400 N. Charles Street**<br>**113 Garland Hall**<br>**Baltimore, MD 21218,**<br><br>**REZA KALHOR,**<br>**3400 N. Charles Street**<br>**113 Garland Hall**<br>**Baltimore, MD 21218,**<br><br>**and,**<br><br>**JUSTUS KEBSCHULL,**<br>**3400 N. Charles Street**<br>**113 Garland Hall**<br>**Baltimore, MD 21218,**<br><br>***Defendants*.** | * * * * * * * * * * * * * * * * * | **Civil Action No. 26-3616-BAH**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Jane Doe ("Plaintiff" or "Doe"), by and through her attorneys, Nesenoff & Miltenberg, LLP and Smithey Law Group LLC, as and for her Complaint against Johns Hopkins

University ("JHU" or the "University"); Reza Kalhor ("Professor Kalhor" or "Dr. Kalhor"), and Justus Kebschull ("Professor Kebschull" or "Dr. Kebschull") (collectively "Defendants") respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1. This case arises out of Johns Hopkins University's fundamentally flawed, procedurally deficient, and bad-faith investigation and adjudication of academic misconduct charges against Plaintiff Jane Doe[1], a high-achieving biomedical engineering student who was on track to graduate early in December 2025 and begin the medical school application process in Spring 2026.

2. The reporting faculty, Professors Kebschull and Kalhor (the "Professors" or the "Individual Defendants"), targeted and wrongfully accused Plaintiff of cheating, plagiarism, and dishonesty, basing their disciplinary process on manufactured and manipulated evidence to achieve a predetermined outcome. Worse, both the initial Hearing Panel and the subsequent Rehearing Board wholly ignored Plaintiff's substantial exculpatory evidence derived from indisputable cloud metadata.

3. Defendants Kalhor and Kebschull violated JHU's own policies and Plaintiff's contractual rights to procedural fairness when they failed to conduct a mandatory review of facts with Plaintiff before filing misconduct charges and tampered with and fabricated evidence to create a false narrative of plagiarism.

4. Additionally, Defendants Kalhor and Kebschull secretly recorded Plaintiff without her knowledge or consent during investigatory meetings in violation of Maryland and Massachusetts wiretapping laws.

---

[1] Plaintiff simultaneously files herewith a motion to proceed by pseudonym in this action.

5. Furthermore, JHU administrators rushed Plaintiff into the initial hearing without giving her sufficient time to review evidence and prepare a defense, and the Rehearing Board falsified the administrative record to cover up the procedural deficiency committed by the faculty.

6. Ultimately, Defendants retaliated against Plaintiff by threatening to escalate—and then in fact increasing—the sanctions after she exercised her contractual right to a rehearing.

7. As a direct result of JHU's violations of its own policies, Plaintiff was forced to resign from full-time employment, self-fund an additional semester at JHU to complete a replacement course, and endure the undue delay of receiving her earned diploma until July 2026 despite completing all graduation requirements in May 2026.

8. This administrative hold was in direct violation of JHU's Graduation Policy, which provides only that the University "may"—not must—withhold a degree with unresolved misconduct charges.

9. JHU's bad-faith actions have derailed Plaintiff's medical school application timeline, damaged her professional reputation, caused severe emotional and psychological distress, and jeopardized her ability to pursue a career in medicine. This catastrophic outcome stands in stark contrast to Plaintiff's near-perfect 3.86 GPA, 98th-percentile MCAT score, extensive clinical experience, and unblemished academic record prior to these fabricated charges.

10. Plaintiff therefore seeks legal and equitable relief for Defendants' unlawful and improper actions which directly violated JHU's own contractual policies and fundamental principles of procedural fairness and contractual rights.

## THE PARTIES

11. Plaintiff is a former student of Johns Hopkins University, originally scheduled to graduate in December 2025. At all relevant times, Plaintiff was and is a citizen and resident of the Commonwealth of Massachusetts.

12. Defendant Johns Hopkins University is a private research university incorporated under the laws of the State of Maryland with its principal place of business located in Baltimore, Maryland.

13. On information and belief, Defendant Kalhor is a citizen and resident of the State of Maryland employed with Johns Hopkins University in the State of Maryland.

14. On information and belief, Defendant Kebschull is a citizen and resident of the State of Maryland employed with Johns Hopkins University in the State of Maryland.

## JURISDICTION AND VENUE

15. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interests.

16. The Court has personal jurisdiction over JHU on the grounds that it conducts business within the State of Maryland.

17. The Court has personal jurisdiction over the Individual Defendants on the grounds that they are employed by JHU, which is located in and conducts business within the State of Maryland.

18. At all relevant times, the actions and events discussed herein transpired within the State of Maryland.

19. Venue for this action properly lies in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred within this District.

## FACTUAL ALLEGATIONS

### I. Background

20. Jane Doe enrolled as a biomedical engineering (BME) undergraduate on the pre-med track at Johns Hopkins University in Fall 2022. As a high-achieving student receiving a GPA of 3.86, Doe planned to graduate early in December 2025 and begin her medical school application process in Spring 2026.

21. Plaintiff was on the Dean's list in Fall 2022, Spring 2023, Fall 2023, Spring 2024, Fall 2024, Spring 2025, and Spring 2026 semesters and has always had a clean academic and disciplinary record prior to this case.

22. In July 2025, Plaintiff took the Medical College Admission Test "MCAT" and achieved an exceptional score, landing in the 98th percentile.

23. Plaintiff was on track to graduate early in December 2025 as she undertook a 23-credit load of courses and research for the Fall 2025 Semester.

24. In October 2025, Plaintiff secured a full-time, compensated position at Johns Hopkins Hospital, and was scheduled to begin employment on January 12, 2026, with the intention to remain in this position for the entirety of the Spring 2026 semester to generate active income and accumulate the requisite clinical experience for her upcoming medical school application.

25. Following the issuance of the academic misconduct charges, Plaintiff's scheduled employment was disrupted, and her medical school application process is indefinitely on hold.

26. JHU conducted a procedurally unsound investigation, hearing, and rehearing and as a result, Plaintiff was forced to resign from her full-time position and fund an additional semester to complete a different required class for her program so she could graduate in the spring.

27. Despite Plaintiff's successful completion of this class, the only remaining requirement to receive her diploma, JHU planned to hold the diploma indefinitely, but released it two months later only when Plaintiff involved legal counsel.

28. Due to JHU's actions, Plaintiff's plans for medical school have been disrupted and indefinitely delayed regardless of her extremely high score on her MCAT, exemplary grades, and track record indicating that she would be an asset to the medical community.

## II. <u>The Course Project</u>

29. Plaintiff's 23-credit load in the fall of 2025 included taking EN.580.432–Principles of Genomic Systems Engineering and Synthetic Biology (the "Class"), taught by Professor Kalhor and Professor Kebshull, and the course included a final project.

30. For the final project in the course, Plaintiff and her project partner selected the prompt, "Multi-hop connectivity: Design a strategy to map neuronal connectivity across multiple synapses in high throughput and with single-neuron resolution."

31. By November 20, 2025, Plaintiff and her project partner had established a multi-step workflow encompassing a dual-barcoding framework for their final collaborative project.

32. Plaintiff and her project partner submitted their project plan on December 3, 2025.

33. On December 4, 2025, they received contradictory and critical feedback from their professors, which prompted them to change their project design.

34. On December 5, 2025, Plaintiff was looped into a meeting between her project partner and a PhD student, both of whom belonged to the Kebschull lab. The PhD student voluntarily shared the file link to her presentation.

35. Unbeknownst to Plaintiff, her partner copied and pasted text from the PhD student's slides into the students' shared research notes, but Plaintiff had not reviewed the PhD student's materials substantively and reasonably relied upon the presumption that the project partner had authored the content.

36. On December 7, 2025, Plaintiff and her project partner submitted their final project write-up, after which the instructors issued no immediate response or feedback. Three days later, Plaintiff's partner copied and pasted the same literature review text from the notes section of the PhD student's slides into the presenter notes section of the PowerPoint file shared between Plaintiff and her partner.

37. On December 11, 2025, Plaintiff and her project partner used their shared PowerPoint file to deliver their final project presentation to the course instructors and class via Zoom. Plaintiff unknowingly read a paraphrased sentence, entirely unaware that the content originated from the speaker notes of the PhD student's slides.

38. After presenting their project and logging off of Zoom, Plaintiff left the room for approximately 15-20 minutes before she was called back into the classroom to meet with the Professors privately, during which she was still being recorded on Zoom without her knowledge.

39. During this conversation, the Professors briefly and casually asked Plaintiff how she and her project partner changed their project design so quickly, if the ideas were their own, and whether Plaintiff received materials from their labs—Plaintiff answered truthfully.

## III. Wiretapping and Covert Surveillance by Defendants Kalhor and Kebschull

*a. Illegal Recording of Post-Presentation Conversation in Violation of Maryland's Wiretap Act*

40. After the presentation, Defendants Kalhor and Kebschull secretly recorded the conversation with Plaintiff to gather secondary and circumstantial evidence to build a case against Plaintiff without her knowledge.

41. Despite the Professors' claim that they continued the Zoom recording following the conclusion of the class presentation session on December 11, 2025, they produced only an audio track of Plaintiff's post-presentation conversation as evidence against Plaintiff in the January 7, 2026 administrative hearing and the June 1, 2026 rehearing.

42. The total absence of a video track for Plaintiff's specific conversation demonstrates that the video data was actively deleted, altered, or withheld by Defendants Kalhor and Kebschull, constituting bad-faith manipulation and spoliation of electronic evidence.

*b. Unauthorized AI Transcription of December 30, 2025 meeting*

43. On December 30, 2025, Plaintiff met with Defendants Kalhor and Kebschull on Zoom for approximately thirty minutes and attempted to defend herself and describe the events leading up to the project. The Professors deployed an automated AI transcription tool during the Zoom call without Plaintiff's knowledge or consent.

44. Shockingly, rather than use this interview to understand what happened during her project, Defendants Kalhor and Kebschull used the transcription against Plaintiff as the foundation for yet another academic misconduct allegation of dishonesty.

45. Even worse, in addition to the fact that Plaintiff was being recorded without her knowledge and consent, before being submitted as evidence during the hearing, the AI transcription was tampered with—specifically, the transcript was manually edited by a human.

46. The December 30, 2025 transcript was submitted as evidence against Plaintiff in both the January 7, 2026 administrative hearing and the June 1, 2026 rehearing.

*c. Defendants' Misrepresentations Regarding the AI Transcription*

47. Defendants Kalhor and Kebschull attempted to disguise the automated nature of the December 30, 2025 meeting transcript by deliberately mislabeling it as "contemporaneous notes."

48. In February 2026, JHU denied the meeting was recorded and stated that "the taking of notes does not violate Maryland or Massachusetts wiretap law."

49. In his April 21, 2026 appeal decision, Vice Dean for Undergraduate Education Dr. Michael Falk ("Dr. Falk") stated, "The instructors…inquired to the Office of Student Conduct…to ask if it was permissibly [sic] to record the meeting."

50. Despite having been explicitly informed by the Office of Student Conduct that notes could be taken but recording was prohibited, the Professors circumvented this explicit prohibition by utilizing an unauthorized transcription tool to electronically capture the December 30, 2025 private interaction.

51. Consequently, the initial assertion of "contemporaneous notes" as a baseline narrative was subsequently shifted to a claim of "typed transcription" in the April 21, 2026 appeal outcome documentation.

52. These documented, compounding misstatements by the Professors completely undermined the faculty's credibility and the integrity of the charges they brought against Plaintiff.

## IV. Procedural Violations and Administrative Irregularities

53. JHU's Homewood Undergraduate Academic Ethics Policy (the "Policy") states that upon suspecting a possible violation, faculty members in charge of the course "must review the facts of the case promptly with the student(s). If, after speaking with the student(s), the faculty

member believes that a violation of academic ethics has occurred, the faculty member must first contact the Office of Student Conduct to determine whether the offense is a first or a second or subsequent offense."

54. During the June 1, 2026 rehearing, Defendants Kalhor and Kebschull testified that they first became suspicious of academic misconduct on December 7, 2025. Despite this alleged timeline, the Professors failed to promptly notify Plaintiff of their suspicions and instead allowed Plaintiff and her project partner to deliver their oral presentation on December 11, 2025, without disclosing any suspected violations of academic ethics during the presentation or during the brief, private conversations that followed.

55. On December 29, 2025, several weeks after Plaintiff and her project partner first submitted their project write-up and then orally presented their project, Professors Kebschull and Kalhor sent academic misconduct forms to Plaintiff and her project partner without following JHU's policies covering first time offenses. For first time offenses, when the violations warrant a failing grade, the reporting faculty must go directly to the Office of Student Conduct.

56. The academic sanction selected on the misconduct form lowered Plaintiff's final course grade by two letter grades. In an accompanying email, the instructors stated that Plaintiff's overall grade was a "C." Plaintiff later learned on December 30, 2025, that the instructors had assigned Plaintiff an effectively failing grade on the project, which accounted for forty percent (40%) of the course and brought Plaintiff's overall grade down to a "C." The two-letter-grade reduction was then applied resulting in a final course grade of failure ("F").

57. The academic misconduct form made unsubstantiated allegations against Plaintiff and her project partner stating they plagiarized by submitting a project design "nearly identical"

to the PhD student's project design, and cheated by using a design from the lab. At the time of filing, the Professors provided no objective evidence to support or substantiate these claims.

58. On the official academic misconduct form, the faculty recorded Plaintiff's first-time offense status, a specific tracking metric that only the Office of Student Conduct is authorized to provide. The inclusion of this internal data definitively establishes that the faculty contacted the Office of Student Conduct regarding Plaintiff's disciplinary record on or before December 29, 2025, when a mandatory fact review with Plaintiff had not been conducted.

59. Upon receipt of the misconduct form, Plaintiff requested an immediate meeting with the Professors to address the allegations and seek a resolution. In response to Plaintiff's request, Professors Kebschull and Kalhor scheduled a Zoom call for December 30, 2025, at 8:30 am to discuss the alleged academic misconduct violations.

60. During the December 30 Zoom meeting, the Professors announced the academic misconduct charges and sanction but still did not conduct a fact review. For instance, they did not present a direct comparison of Plaintiff's project design versus the PhD student's lab design to substantiate the allegation of plagiarism.

61. Instead, the Professors formulated their questioning to pressure Plaintiff, and later used Plaintiff's statements under pressure against her in the hearing and rehearing.

## V. <u>First Hearing & Outcome</u>

62. On January 5, 2026, Plaintiff formally rejected all academic misconduct charges.

63. On January 6, 2026, Plaintiff was informed that an administrative hearing would take place the following day.

64. On January 7, 2026, just hours before the hearing was to take place, Plaintiff was provided the opportunity to review the evidence files submitted by the Professors for the first time.

65. During the hearing, the Professors were allowed to take over the hearing space, participate as parties, and deliver structured presentations, in contradiction to the Policy's explicit designation that this proceeding be a closed meeting.

66. Not only did Plaintiff have insufficient time to prepare a defense, but she discovered during the hearing that there were several issues with the evidence that was being used against her. This tainted evidence also persisted entirely in the June 1, 2026 rehearing.

67. First, the Professors manufactured and presented a slide comparing the PhD student's project to that of Plaintiff and her project partner, which was problematic for many reasons: (i) the Professors presented nearly identical graphs and attributed one of them to Plaintiff and her project partner, even though such a graph does not appear anywhere in their final project, presentation slides, or digital version history; (ii) the graph attributed to Plaintiff was fabricated to manufacture a false appearance of direct copying—it was not what Plaintiff and her partner *actually submitted*; and (iii) the presentation of a completely manufactured graph suggests malicious intent designed to make it impossible for Plaintiff to defend herself.

68. During the subsequent June 1, 2026 rehearing, Defendant Kebschull formally admitted to the Rehearing Board that the comparison graph was drawn by Defendants themselves to "simplify the biology," an action that erased significant design differences.

69. Second, Defendants Kalhor and Kebschull presented two identical sets of bullet point text and attributed one set of text to Plaintiff and her project partner, creating a false appearance of verbatim textual copying.

70. The text attributed to Plaintiff—and implicating her in direct verbatim copying—appeared nowhere in her project. However, the Panel and Board members accepted the comparisons made by the Professors at face value.

71. The January 7, 2026 administrative hearing panel (the "Panel") erroneously accepted these falsified visual and textual comparisons as authentic, heavily basing its adverse finding on these fabricated comparisons: (i) the Panel sustained the plagiarism charge based on the mistaken belief that Plaintiff's project "closely mirrored that of the PhD student's work," and (ii) sustained the cheating charge based on the "similarity between their work and the PhD student's."

72. Similarly, the June 1, 2026 Rehearing Board remained deeply biased by the same foundational distortion, as evidenced by its conclusion that Plaintiff "failed to acknowledge the work of [the PhD student] anywhere in their presentation and submitted work … that was the same or substantially similar to [the PhD student]'s work."

73. Third, the Professors presented unsubstantiated online file statistics, generated by the PhD student, to claim that Plaintiff repeatedly opened and reviewed the PhD student's project presentation file, but this data did not identify the specific individuals who opened or reviewed the file, failed to link Plaintiff's specific account or device to the viewing history, and did not definitively attribute any "access" to Plaintiff except for the last view.

74. Even if they *had* presented proper evidence, the faculty erroneously equated opening a file with cognitively reviewing its contents, despite automated background syncing or incidental triggering of "access" timestamps.

75. It is not remarkable that Plaintiff had access to the file because other students did as well. What is remarkable is that during the June 1 rehearing, Defendant Kalhor admitted that the faculty possessed the authority to request authenticated, user-linked access logs from the JHU Information Technology (IT) office, but he "deemed it unnecessary."

76. Meaning, they could have obtained exculpatory information, yet decided not to.

77. Notwithstanding, the Panel explicitly relied on this unauthenticated access data to sustain the cheating charge, noting in its February 19, 2026, outcome letter that the "documented access of the PhD student's work" was a foundational basis for its determination.

78. The June 1, 2026 rehearing panel similarly adopted this unverified access data, citing the anonymous "access" numerous times to justify its adversarial finding.

79. Fourth, portions of text from the PhD student's slides were presented at the hearings, one sentence of which Plaintiff had paraphrased in her presentation.

80. The information omitted in the submission of this evidence, however, was critical: Plaintiff was not aware that her project partner copied and pasted the PhD student's presenter notes into their shared research notes, and the first time she learned about her partner's actions was *during the first hearing*.

81. Much like the unsubstantiated, anonymous online file access statistics, this copied text does not link the copy-and-paste actions to Plaintiff's specific user account; despite this failure of proof, Defendants and the Panels accepted the copied text as evidence of Plaintiff's wrongdoing.

82. Fifth, during the hearing, the Professors presented an audio recording and transcript of the private conversation held after the presentation of Plaintiff's project on December 11, 2025, which as previously mentioned, had been tampered with.

83. Nevertheless, the Panel again relied on this unsubstantiated and unauthorized evidence in finding Plaintiff responsible for academic misconduct violations.

84. Sixth, the Professors submitted as part of their evidence "contemporaneously" transcribed notes taken during the December 30, 2025 meeting.

85. Once again, Plaintiff was not aware of, and did not consent to, the recording of this meeting, yet it is apparent that the meeting was recorded and transcribed through AI.

86. Instead of adhering to the administrative directive to take written notes, the faculty circumvented the explicit prohibition against recording and altered the transcript with a biased narrative, resulting in a highly prejudicial document that should never have been permitted.

87. Seventh, the Professors presented evidence of a conversation between the PhD student and Plaintiff's project partner that took place over Slack in December 2025.

88. Plaintiff had not been part of the conversation, and the open nature of Slack makes it hard to believe students would knowingly commit academic misconduct on a platform their professors could access.

89. On February 19, 2026, in light of the inaccurate and procedurally erroneous evidence presented by the Professors, the administrative hearing results were issued, finding Plaintiff responsible for plagiarism, cheating, and lying.

90. As a result, the Panel issued the following sanctions: (i) formal warning; (ii) failure of course; and (iii) attendance at an academic integrity workshop.

91. The outcome letter notified Plaintiff of her right to appeal within ten business days based on procedural errors, new information, and/or the excessiveness of the sanction.

92. Shockingly, the charge of "lying" was included as *an additional charge*, in response to Plaintiff defending herself against the first two charges, constituting a clear violation of her procedural due process rights.

## VI. The Appeal & Rehearing

93. On March 5, 2026, Plaintiff appealed the decision based on the procedural errors and the excessiveness of the sanction.

94. On April 21, 2026, Interim Director of Student Conduct, Amy Beltran ("Ms. Beltran"), notified Plaintiff that her appeal was denied by Dr. Falk because Plaintiff's petition did

not provide substantial new information that would reasonably have affected the finding, nor did he find the sanction imposed to be excessive.

95. Dr. Falk stated that while he believed there was no procedural error in the adjudication of the case, he did believe that the timeline for the administrative hearing was excessively expedited and that the detailed and technical evidence upon which the case ultimately rested was not known to Plaintiff or the Office of Student Conduct at the time the expedited schedule was determined.

96. Dr. Falk agreed that the evidentiary record warranted more than two hours for Plaintiff to formulate a response and noted that Plaintiff would be permitted to request a rehearing of the case by a full panel within five business days of receiving the decision. He noted however that a new panel would be provided with the same evidentiary record as the original panel.

97. Dr. Falk further stated that the rehearing panel could reaffirm the original decision or "decide upon a stiffer sanction" and made no mention of the panel's authority to vacate or reverse the original decision.

98. Weaponizing an appeal remedy by threatening a student with an escalated penalty for seeking a fair hearing constitutes administrative coercion that violated Plaintiff's contractual rights and fundamentally contaminated the rehearing panel.

99. Thus, though Dr. Falk offered a rehearing, by failing to cure the erroneous defects that took place in the first hearing—including the fabricated and uncorroborated evidence presented by the Professors—this concession was nothing more than a hollow gesture.

100. On April 28, 2026, Plaintiff requested an expedited rehearing to take place prior to May 21, both to preserve her chance of graduating in May 2026, and to address the procedural and evidentiary issues from the first hearing.

101. On May 5, 2026, Ms. Beltran responded to Plaintiff's request for an expedited hearing, stating that their policy does not include a required timeline for resolution of cases, and that JHU was unable to guarantee the case would be resolved prior to May 21, 2026.

102. As far as the conferral of her degree, Ms. Beltran confirmed to Plaintiff: "*Your degree conferral should not be impacted if you have been cleared for graduation without [the course in which the charges arose].*"

103. In reliance on this information, Plaintiff sought confirmation from her academic advisor, Rachel Nelson ("Ms. Nelson"), that her degree would indeed be conferred, even if the rehearing did not take place until after graduation.

104. Ms. Nelson then contacted Dr. Falk who maintained his initial position that Plaintiff's degree would be held until after the case was resolved.

105. Nevertheless, Plaintiff elected to participate in a rehearing considering the various procedural errors, and the false and misleading evidence relied upon by the original panel.

106. The rehearing took place on June 1, 2026—eleven days after the University's Spring 2026 commencement.

107. Despite Dr. Falk's representation in the April 21, 2026 decision letter that the full panel would be provided with the same evidentiary record as the original panel, that was not the case.

108. Specifically, Plaintiff learned that the PhD student from the Kebschull and Kalhor labs, who did not testify at Plaintiff's first hearing, would be appearing as a witness at the rehearing and the Professors' presentation of evidence from the January hearing was revised and submitted.

109. Plaintiff presented time-stamped evidence showing that she absolutely did not copy and paste the notes, and a PowerPoint showing her contribution to the project, the literature used,

a detailed chart showing exactly how the published work was synthesized, and side-by-side graphs showing the difference between the Professors' lab design and what she and her project partner had *actually submitted.*

110. Plaintiff addressed the "dishonesty" charge by stating that she voluntarily disclosed the PhD student's meeting on December 11, 2025, and argued that using statements she made while addressing the first two charges was a violation of her rights, as those statements were being used to bring an additional charge of dishonesty against her.

111. Plaintiff raised her concerns about the procedural issues, specifically that after her presentation, no issues were raised for 18 days and that the meeting addressing the misconduct didn't occur until *after* the Office of Student Conduct was contacted and the academic misconduct form was submitted with no evidence, which was procedurally out of order.

112. Plaintiff also stated that she did not give consent to be recorded on December 11, 2025, and that her consent was limited and given only for recording the class Zoom meeting and never should have been used against her in the first hearing.

113. Plaintiff requested that the following faculty evidence be disregarded: recording and transcript of December 11 meeting, transcript of December 30 meeting, file statistics screenshots, and a list of fabricated and inaccurate slides.

114. However, none of the faulty evidence was disregarded, and none of Plaintiff's evidence was considered.

## VII. Outcome of the Rehearing

115. In the July 2, 2026 decision letter, the Academic Ethics Board ("the Board") of the June 1 rehearing determined that Plaintiff was responsible for cheating, plagiarism, and forgery/falsification/lying, in violation of the Policy.

116. Consequently, the Board put Plaintiff on Deferred Suspension status for the entirety of the time she is a student at JHU should she return for further education, upheld her failing grade in the Class, and added the transcript notation "FEV"—failure for ethical violation.

117. While the Board stated in the decision that it studied all previously mentioned evidence, a reading of the decision makes this difficult to accept as the rehearing focused solely on information that was presented by Professor Kalhor and Professor Kebschull.

118. There is no mention of any evidence Plaintiff presented at the hearing or rehearing—no discussion of the falsified evidence, the procedural issues, the tampering of evidence, the recording/transcription taken without her consent—even the explanations that Plaintiff gave about her project were never discussed.

119. The Board failed to acknowledge or even mention Plaintiff's time stamped evidence which confirmed that when her project partner copy-and-pasted text from the PhD student's presentation, Plaintiff was not in-person with her project partner.

120. The Board failed to acknowledge the evidence proving both that the portion of the project that allegedly had similarities to the PhD student's project *predated* the meeting with the PhD student, and the conceptual design originated from lectures and papers *provided in class.*

121. The Board's erroneous conclusion regarding the concepts in Plaintiff's project stemmed from a fundamental misunderstanding of basic biochemistry and whether intentional or unintentional, this lack of technical understanding represented a gross misstatement of the evidentiary record, which undoubtedly affected the rehearing outcome.

122. In the rehearing, Dr. Kalhor testified that he was "shocked" upon reviewing Plaintiff's submission on December 7, allegedly stating to Dr. Kebschull that the students "got our

project" and questioned whether they had seen their grant application. Dr. Kalhor offered no corroborating evidence to support this claim.

123. Importantly however, the Professors had the submissions in their possession before Plaintiff and her project partner presented the project on December 11.

124. Despite the Professor's alleged "shock", they still allowed the students to present it on December 11, planning only to "ask a few questions to see if they understand."

125. Even if the Professors had truly observed what they considered indisputable evidence of plagiarism, they violated JHU's policy when they failed to review the facts of the case promptly with the students.

126. Alternatively, if the faculty's claim of discovering plagiarism on December 7 is false, they deliberately withheld their suspicion to allow the presentation to proceed on December 11, subsequently using it as pretext to covertly gather evidence without giving the students notice or a chance to clarify.

127. The Board failed to investigate and ask the Professors follow-up questions about their motives, or why they allowed the students to present the project.

128. The Board did not address whether meeting with someone from the lab "to stir ideas" was prohibited by the syllabus.

129. The Board also relied on anonymous, unauthenticated server traffic data even though faculty possessed the authority to request authenticated, user-linked access logs from the JHU IT office, which would have been exculpatory information. The failure to obtain the logs represents a reckless mishandling of the evidence.

130. The Board relied on the Professors' side-by-side graphical and textual comparisons mapping Plaintiff's project directly next to the PhD student's, even though the Professors admitted

to manufacturing the graphs, and failed to consider Plaintiff's evidence showing what she *actually presented*.

131. Because the Board had a severe lack of technical understanding, which led to their finding similarities between the two projects where none existed, they erroneously concluded that it was more likely than not that Plaintiff used unauthorized materials and unauthorized collaboration to copy the work of another individual.

132. Defendants Kalhor and Kebschull did *not* raise, discuss, or even mention any alleged "similarities" between Plaintiff's presentation and the PhD student's presentation during the December 11, 2025 meeting, and a comparison of the two presentations had never been conducted until the faculty mounted their ambush prosecution at the January 7, 2026 administrative hearing.

133. By falsely claiming that the faculty discussed presentation similarities face-to-face with Plaintiff on December 11, 2025, the Board made the December 11 meeting look like a contractually compliant "fact-review session" and based its decision on a reckless disregard for the actual evidence.

134. Further, the Board blended two entirely separate interactions, spaced 19 days apart, into a single, distorted event narrative.

135. The Board's decision letter further recounted a discussion on ADAR, one of the components of Plaintiff's project, during the same meeting; in reality, the topic of ADAR was discussed during the December 30 Zoom meeting, not the December 11 in-person meeting.

136. This artificial conflation of the event timeline invalidated the integrity of the rehearing process.

137. Plaintiff was found responsible for all charges, and beyond receiving a failing grade, the Board added two severe penalties: a permanent "FEV" notation on her official transcript and a status sanction of deferred suspension.

138. As part of the rehearing outcome, Plaintiff was notified that she had the right to appeal the decision to the Associate Vice Dean for Graduate Education and Lifelong Learning within ten days from the date of the letter on the grounds of procedural error, new information, and excessiveness of the sanctions.

139. On July 10, 2026, Plaintiff timely filed an appeal based on procedural violations, material contractual breaches, and grossly disproportionate and retaliatory sanctions.

140. While the conduct process remained ongoing, JHU refused to issue Plaintiff her degree, despite having completed all required courses and credits as of May 2026.

## VIII. <u>Appeal Outcome of Re-Hearing Decision</u>

141. Two months later, on September 10, 2026, JHU issued a decision denying Plaintiff's appeal of the re-hearing decision.

142. Failing to address the majority of the arguments made in Plaintiff's appeal, Associate Vice Dean of Graduate Education and Lifelong Learning Christine Kavanagh ("Dean Kavanagh") found no grounds on which to revise the finding or sanction issued by the June 1, 2026 re-hearing panel, or to convene a third hearing panel.

143. Dean Kavanagh concluded that Plaintiff's arguments concerning procedural violations related to events that took place prior to the initial administrative hearing were outside the scope of the current appeal.

144. However, the Policy provides as a ground for appeal, "procedural error that could have materially affected the determination of responsibility or sanction(s)." It does not specify that

the alleged procedural violations must have occurred after the initial administrative hearing but prior to the re-hearing.

145. In any event, Plaintiff's appeal of the re-hearing decision did include procedural errors that occurred following the initial hearing: (i) Dr. Falk's failure to cure the structural defects of the initial proceeding in his April 21, 2026 appeal decision; (ii) the faculty's fabrication of plagiarism evidence and material evidentiary alteration on June 1, 2026; (iii) the misuse of anonymous file access statistics as definitive incriminating evidence on June 1, 2026; (iv) complete disregard of exculpatory version history and improper imputation of guilt on June 1, 2026; (v) the re-hearing board's falsification of the record and material fabrication to manufacture procedural compliance in its July 2, 2026 re-hearing outcome letter; (vi) the re-hearing board's willful suppression of exculpatory evidence in its July 2, 2026 re-hearing outcome letter; (vii) the re-hearing board's distortion, contradiction, and misrepresentation of facts and Plaintiff's testimony in its July 2, 2026 re-hearing outcome letter; and (viii) the re-hearing board's flawed evidence interpretation and adjudicative bias demonstrated in its July 2, 2026 outcome letter.

146. Additionally, Dean Kavanagh denied that the faculty members failed to adhere to the procedures applicable when misconduct is suspected, and denied that Plaintiff was deprived of due process under the policy.

147. Dean Kavanagh further stated that because JHU is a private university, it can practically use any "credible" evidence, regardless of whether the evidence was obtained unlawfully, unethically, or in violation of the University's own policies. This decision explicitly endorses on the record that the altered recording, edited AI transcript, the faculty's self-drawn graphic comparison, and anonymous online file access statistics constitute "credible" evidence.

148. This was the final step in JHU's conduct process.

## IX. Harm to Plaintiff's Medical-School Applications & Employment Prospects

149. JHU's failure to timely confer Plaintiff's degree—due to a pending conduct matter for which JHU bears sole responsibility for both the delay and unresolved status at the time of graduation—constitutes retaliatory conduct and a violation of Plaintiff's procedural rights.

150. Given Plaintiff's near-perfect GPA, 98th percentile MCAT score, clinical experience, and volunteer work, these allegations of academic misconduct are inconsistent with the person Plaintiff has proven to be throughout her academic career.

151. JHU's actions and undue delay in issuing Plaintiff's diploma have damaged her medical school applications, impaired her prospective educational opportunities, destroyed her chance of obtaining admission to medical school for at least a year or pursuing a career in medicine altogether, and harmed her reputation.

152. Plaintiff has suffered and continues to suffer emotional, psychological, financial and reputational damages as a direct and proximate result of JHU's false, unsupported, unfair, and materially misleading investigation.

153. JHU's actions have harmed and continue to harm Plaintiff financially as she was forced to leave her employment, fund an additional semester of school, and delay her medical school applications.

**Count I**
**Breach of Contract**
**(Against JHU)**

154. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

155. At all relevant times, a contractual relationship existed between Plaintiff and Defendant JHU by virtue of Plaintiff's enrollment at the University and as defined by and through the policies and procedures governing her program.

156. Upon Plaintiff's matriculation to the University, JHU provided her with a copy of the Graduation Policies and the Homewood Undergraduate Academic Ethics Policy.

157. Through these written policies, JHU provided specific and enforceable provisions regarding the administration of the program and academic disciplinary procedures, which constitute valid and binding contractual terms.

158. Any failure on the part of JHU to follow promised procedures in the disciplinary and investigative process would therefore constitute a violation of the University's contract with its student, Plaintiff.

159. In Maryland, to establish a claim for breach of contract, "a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *S. River Cap., LLC v. Manufacturers & Traders Tr. Co.,* 815 F. Supp. 3d 385, 400 (D. Md. 2025).

160. Courts applying Maryland law have recognized breach of contract claims between students and private universities. *See Harwood v. Johns Hopkins Univ.,* 130 Md. App. 476, 483 (2000).

161. Indeed, "[w]hen a student is duly admitted by a private university…there is an implied contract between the student and the university that, if the student complies with the terms prescribed by the university, the student will obtain a degree." *Harwood*, 130 Md. App. at 483.

162. The "terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications of a university, and the university is

required to conduct its hearings and enforce its policies consistent with the terms." *Id.* (internal citations omitted).

163. Defendants violated its contract with Plaintiff when it failed to adhere to the language in the Graduation Policy and the Homewood Undergraduate Academic Ethics Policy.

**A. Homewood Undergraduate Academic Ethics Policy**

164. The Policy and the Homewood Undergraduate Academic Misconduct Form govern the procedures for handling suspected violations of academic integrity at JHU, establishing mandatory procedural safeguards to ensure fairness, transparency, and due process in misconduct proceedings.

*i. Violation: Failure to Promptly Review the Allegations with Plaintiff*

165. The Policy states that if a student is suspected of a possible violation of academic ethics, the faculty member in charge must promptly review the facts of the case with the student.

166. The Professors failed to comply with the Policy's mandatory requirement to review the facts with Plaintiff, in direct violation of the contractual terms.

167. Despite having possession of Plaintiff's work and the ability to review it immediately after Plaintiff submitted the project write-up on December 7, 2025, and after the final project presentation on December 11, 2025, the Professors did not contact Plaintiff regarding any alleged misconduct concerns until 22 days after submission and 18 days after the presentation.

168. On December 29, 2025—more than three weeks after the project submission—Professor Kalhor emailed Plaintiff an academic misconduct form alleging cheating, plagiarism, and dishonesty, marking the first time Plaintiff was informed of any allegation against her.

169. The academic misconduct form delivered to Plaintiff on December 29, 2025, left the field designated for *"Date(s) discussed charge with student"* entirely blank. This omission

proves that the Professors finalized their determination of guilt and assignment of sanctions before providing Plaintiff any opportunity to review the facts or present a defense.

170. The academic misconduct form showed verification of Plaintiff's first-time offense status, proving Defendants Kalhor and Kebschull contacted the Office of Student Conduct to obtain this status while bypassing the mandatory review of facts with Plaintiff.

171. Only after Plaintiff requested a meeting did Professor Kalhor agree to discuss the allegations on December 30, 2025—one day after delivering the completed misconduct form.

172. By failing to initiate any discussion of the alleged misconduct until after contacting the Office of Student Conduct and completing and submitting the official form documenting findings and sanctions, Professors Kalhor and Kebschull denied Plaintiff the *"prompt review of the facts"* mandated by the Policy.

*ii. <u>Violation: Failure to Fulfill Teaching Responsibilities</u>*

173. The Policy explicitly assigns to instructors the responsibility for *"specifying at the beginning of each semester or term the basic rules and procedures for any and all coursework, examinations, and other academic exercises."*

174. The course syllabus for EN.580.432 identifies four course goals, including *"[d]iscussion and communication with other scientists."* The course syllabus contains no written prohibition against contacting or speaking with members of the instructors' labs during the project phase, no written definition of what constitutes "materials from instructors' labs" or what interactions with lab members, if any, would be permissible.

175. At the January 7, 2026 administrative hearing and June 1, 2026 rehearing, Professor Kalhor admitted that any rule prohibiting students from speaking with lab members was conveyed only verbally in class, not in writing, when the project was introduced in November 2025.

176. There is no evidence that the rule was conveyed to the students at the beginning of the semester as required by the Policy.

177. Mid-semester, verbal-only communication of critical project constraints—especially those carrying the penalty of a failing grade—creates an unacceptable level of ambiguity and violates the Policy's requirement for specification at the beginning of the semester.

178. By failing to document in the official course syllabus a prohibition that would later form the basis for academic misconduct charges, resulting in a failing grade, an "FEV" notation, and a status sanction of deferred suspension, Defendants Kalhor and Kebschull failed to fulfill their core teaching responsibilities under the Policy.

179. This failure to provide clear, written notice for critical project constraints at the beginning of the semester constitutes a material procedural breach that made compliance impossible and enforcement fundamentally unjust.

*iii. Violation: Unauthorized Faculty Participation in Administrative Hearing*

180. The Policy states "*An administrative hearing involves a meeting between a conduct administrator, faculty board member, and the respondent…The conduct administrator and faculty board member may also meet with witnesses and others involved and obtain and review relevant evidence. The conduct administrator and faculty board member will review the allegations and evidence with the respondent and give the respondent an opportunity to respond.*"

181. The Policy also authorizes the conduct administrator and faculty board member to *"meet with witnesses and others involved"* separately but does not authorize witnesses or reporting parties to attend or participate in the hearing with the respondent. Nowhere in the Policy is the merging of reporter and witness roles authorized.

182. Contrary to the Policy's specification that an administrative hearing involves only a conduct administrator, a faculty board member, and the respondent, Professors Kalhor and Kebschull attended Plaintiff's hearing on January 7, 2026.

183. During the hearing, Professors Kalhor and Kebschull were permitted to make statements and deliver a presentation of their accusations directly to Plaintiff and the hearing panel.

184. The inclusion of the accusing faculty members created an adversarial environment not sanctioned by the Policy.

*iv. Violation: Inadequate Notice and Denial of Preparation Time*

185. Professors Kalhor and Kebschull provided zero supporting documentation when they delivered the academic misconduct form on December 29, 2025. Plaintiff remained entirely unaware of the specific nature, technical details, and evidentiary basis of the allegations until the day of the hearing.

186. Plaintiff was given only a few hours immediately prior to the hearing on January, 7, 2026 to review the Professors' evidence file for the first time. In that narrow window, it was physically and intellectually impossible for Plaintiff to review the nature and evidence of the allegations in a meaningful way.

187. This extreme time constraint placed Plaintiff at an insurmountable disadvantage and directly contradicted the principles of a fair and transparent academic hearing process.

188. The one-day notice, combined with the Professors' earlier failure to provide supporting evidence, denied Plaintiff meaningful opportunity to prepare a defense.

*v. Violation: Unequal Treatment and Procedural Inequity*

189. The Student Conduct Office and hearing panel demonstrated glaring disparities in how they treated the reporting faculty members versus Plaintiff.

190. For instance, JHU permitted Professors Kalhor and Kebschull to amend their initial evidentiary slide deck after the official document submission deadline for the January 7, 2026 administrative hearing had passed.

191. In stark contrast, Plaintiff was explicitly informed that she was not permitted to amend her submissions for the same hearing after the deadline.

192. JHU also prohibited Plaintiff from downloading, taking screenshots, or copying content from the evidence file submitted by the Professors for use in her defense and appeal.

193. The Professors, on the other hand, were free to use Plaintiff's submitted materials in their presentation.

194. These unequal rules gave the reporting faculty members a significant and unauthorized tactical advantage while directly contradicting the University's public representations regarding impartiality.

195. The disparate treatment violated fundamental principles of fairness and demonstrated that the process was structured to favor the accusers over the accused.

*vi. Violation: JHU's Ratification of Procedural Breaches and Statutory Violations*

196. Following the administrative hearing decision, Plaintiff filed a formal appeal with the appellate authority, Vice Dean Dr. Falk, placing the University administration on notice of Defendant Kalhor's and Defendant Kebschull's contractual breaches and statutory violations.

197. In his formal decision letter dated April 21, 2026, the Vice Dean summarily rejected Plaintiff's appeal and ratified the faculty's procedural misconduct.

198. Addressing the faculty's failure to conduct a contractually mandated fact review with Plaintiff prior to verifying Plaintiff's first-time offense status with the Office of Student

Conduct and filing charges, the Vice Dean wrote: "While this date appears to have been omitted from the form, the case was in fact discussed with you, as you have acknowledged."

199. By validating the deceptively incomplete misconduct form and condoning the faculty's procedural breaches, the Vice Dean acted in bad faith, resulting in a material breach of contract by the University.

200. Furthermore, despite being provided with clear evidence that the faculty conducted unauthorized recording and deployed an unauthorized AI transcription tool to bypass a recording ban, the Vice Dean summarily dismissed the claims, writing: "Your claims of statutory violations appear to me to be unfounded."

201. The Vice Dean possessed the authority to investigate both instances of unlawful surveillance, but chose to declare the felony wiretap violation claims "unfounded" without seeking and reviewing objective electronic metadata.

202. Through these official written statements, the Vice Dean formally ratified the faculty's misconduct, adopting the individual faculty members' violations as the official acts, policies, and liabilities of Defendant JHU.

203. Similarly, following the re-hearing, Plaintiff filed an appeal with the appellate authority, Associate Vice Dean Christine Kavanagh.

204. In her appeal decision letter dated September 10, 2026, Dean Kavanagh summarily rejected Plaintiff's appeal and ratified the faculty's and JHU's procedural misconduct.

205. Dean Kavanagh found no grounds on which to revise the finding or sanction issued by the June 1, 2026 re-hearing panel, or to convene a third hearing panel.

206. Notwithstanding that Plaintiff's appeal of the re-hearing decision identified various procedural errors committed by Dr. Falk, the faculty members, and the re-hearing panel, Dean

Kavanagh denied that the faculty members failed to adhere to the applicable procedures in cases where academic misconduct is suspected, and denied that Plaintiff was deprived of due process under the Policy.

207. Through these official written statements, Dean Kavanagh formally ratified the faculty's misconduct, adopting the individual faculty members' violations as the official acts, policies, and liabilities of Defendant JHU.

*vii. Violation: Vice Dean's Threat and Rehearing Board's Follow-Through on Retaliatory Sanctions*

208. The Vice Dean's appeal decision letter granted Plaintiff a rehearing but structured the proceeding to validate a predetermined finding of guilt.

209. The Vice Dean asserted that Plaintiff's appeal did not provide substantial new information that "would reasonably have affected the finding."

210. The Vice Dean maintained that his evaluation satisfied "an independent review of the evidence" and "an impartial evaluation of the case."

211. The Vice Dean advised that the incoming rehearing panel would "be provided with the same evidentiary record and this response to [Plaintiff's] petition."

212. By declaring the faculty's evidence sound at the senior appellate level and providing his adversarial written response to the new board, the Vice Dean signaled to the lower board what outcome was expected.

213. The Vice Dean further advised that the Rehearing Board "could reaffirm the original decision or decide upon a stiffer sanction," without any mention of the panel's ability to vacate or reverse the original decision.

214. The Rehearing Board followed through on the Vice Dean's threat of stiffer sanctions and following the June 1, 2026 rehearing, escalated the penalties to include an "FEV"

transcript notation and a deferred suspension on top of the original course failure, without presenting a legitimate basis for doing so.

*viii. Violation: The Rehearing Board's Reckless Disregard for Evidence*

215. In recognition of the initial hearing violations regarding notice and preparation time, Defendant JHU granted Plaintiff a rehearing, which took place on June 1, 2026.

216. The Rehearing Board was composed of two academic advising staff members and three undergraduate students, who demonstrated a lack of capacity to parse complex, technical evidentiary timelines.

217. The Rehearing Board failed to analytically evaluate the true record. Instead, the Board displayed a reckless disregard for the actual evidence, constructing a false narrative of the December 11, 2025 meeting in its July 2, 2026 decision letter.

218. The Board conflated separate interactions and fabricated a face-to-face project design comparison discussion that objectively did not occur during the December 11, 2025 meeting. This fabrication falsely portrays the meeting as a contractually compliant, fact-review session preceding the reporting faculty's contact with the Office of Student Conduct.

219. Basing the final rehearing decision on false narratives directly contradicted by the evidentiary record failed to cure JHU's underlying contractual breaches, rendering the purported remedy an administrative sham and resulting in a fundamentally unfair determination.

*ix. Violation: The Hearing Panel/Board Failed to Exercise Due Diligence*

220. The January 7 Hearing Panel and June 1 Rehearing Board displayed a lack of due diligence by failing to critically evaluate the evidence presented by the Professors.

221. The Panel and the Board acted as a passive conduit for the Professors' unsubstantiated claims while disregarding Plaintiff's evidence and statements.

222. The Panel and the Board accepted the reporting faculty's fabricated technical comparisons between Plaintiff's project and the PhD student's project without conducting independent verification or permitting technical rebuttals.

223. Despite Plaintiff's timestamped research history documents demonstrating independent project development inspired by open-access literature and the course curriculum, the Panel and the Board failed to explain why this exculpatory evidence was insufficient to invalidate the Professors' plagiarism theory.

224. The Panel's and the Board's decision-making prioritized the Professors' subjective accusations over Plaintiff's timestamped, objective research records.

225. The Panel and the Board also admitted into evidence materials obtained through potential violations of Maryland and Massachusetts privacy and wiretap laws.

226. By failing to strike illegally obtained evidence from the record and instead using that material in their own decision-making, the Panel and the Board demonstrated incompetence in understanding and applying the legal and ethical standards governing university proceedings.

227. The Panel's and the Board's decisions lack independent analysis of the preponderance of evidence, and their near-verbatim adoption of the Professors' accusations suggests prejudicial bias rather than an impartial evaluation of the case.

## B. The Homewood Undergraduate Academic Misconduct Form

228. The Homewood Undergraduate Academic Misconduct Form ("Misconduct Form") serves as the official instrument through which faculty members document, report, and recommend sanctions for alleged violations of academic integrity.

229. Reporting faculty members must complete all information to the best of their ability, verify that the prompt review with students was conducted, and if an instructor imposes a

sanction of lowering a course grade, they are expressly required to note on the form what the grade will be lowered to.

i. *<u>Failure to Provide Supporting Evidence</u>*

230. Under the heading of the academic misconduct form, it states: *"INSTRUCTIONS: Please complete all the following information to the best of your knowledge. Include copies of any relevant documents (e.g. syllabus, assignment in question, emails exchanged…"*

231. The Professors delivered the Misconduct Form on December 29, 2025, with no attached documentation supporting their charges of cheating, plagiarism, and dishonesty.

232. For the cheating charge, the Professors failed to provide the course syllabus or identify specific rules that had allegedly been violated.

233. For the plagiarism charge, the Professors provided no evidence demonstrating that Plaintiff had used "nearly identical" designs or language or "cheated by using a design from our labs", nor any documentation showing their lab design, Plaintiff's design, or any comparative analysis between the two.

234. For the dishonesty charge, the Professors' description on the Misconduct Form revealed that the lying allegation was based solely on Plaintiff's rejection of the cheating and plagiarism charges stating *"In our view, [Plaintiff] plagiarized the work of PhD student. Additionally, they cheated by using a design from our labs even as it was explicitly disallowed. Finally, they lied about having done so after their final presentation in the class."*

235. By characterizing Plaintiff's denial of unproven allegations as itself constituting an additional ethics violation, the Professors effectively penalized Plaintiff for contesting the first two charges.

ii. *<u>Failure to Note What Plaintiff's Grade Would Be Changed To</u>*

236. When imposing a sanction to lower a course grade, the Misconduct Form expressly instructs the reporting faculty member to *"note to what it will be lowered."*

237. The Professors filled in "by two letter grades" in violation of the Policy.

238. In concurrent communications with Plaintiff, Professor Kalhor stated that Plaintiff would receive an overall course grade of "C" without consideration of the misconduct charges.

239. Thus, a reduction by "two letter grades" simply meant that they were failing Plaintiff.

240. By omitting this final grade on the form, the Professors made the sanction appear less severe than course failure.

241. The Misconduct Form provides an option to *"Recommend the Case to be Forwarded to Hearing Board"* with instructions stating *"Check this option only if you believe that a serious violation has occurred that may warrant a sanction of failure in the course or greater…in such cases, this form should be forwarded to the Student Conduct Office, who will handle the case."* By omitting the final grade of "F" from the Form, the professors avoided triggering the procedural requirement to refer the case to the Office of Student Conduct for independent review.

242. Based on the foregoing, JHU violated the Policy when it failed to conduct a proper investigation and offer Plaintiff a fair hearing and rehearing.

243. JHU breached these provisions when it not only failed to support Plaintiff's academic and professional goals, but also severely hindered her ability to send out medical-school applications and obtain meaningful employment.

244. Quite the opposite of supporting Plaintiff's goals to pursue medical school and a career in medicine, JHU's own actions have deprived her of the opportunity to do so.

**C. JHU's Graduation Policy**

245. JHU's Graduation Policy states "[a] student's degree and/or certificate *may* not be conferred with unresolved charges of misconduct or academic ethics violations."

246. The plain language of this provision indicates that JHU could have conferred Plaintiff's degree, even with the rehearing process pending.

247. The permissive nature of this provision is confirmed when contrasted with the language of non-permissive provisions contained in the same policy.

248. For example, the Graduation Policies state: "[a]ll grades and credits for courses that are required for graduation *must* be submitted in time to clear students for graduation," and "[a]ll outstanding balances *must* be paid in full before a student's diploma may be released."

249. During the spring semester of 2026, Plaintiff completed all academic and degree requirements for graduation in May 2026.

250. Notwithstanding, Dr. Falk declined to confer Plaintiff's degree on time in May 2026, contending that JHU's practice is to hold degree conferral pending the resolution of any conduct charges, yet failed to cite any applicable policy.

251. The refusal to confer Plaintiff's degree in May 2026 was therefore a direct violation of the University's Graduation Policies.

252. Based on the aforementioned facts and circumstances, JHU created express and implied contracts when it offered, and Plaintiff accepted, admission to JHU, and when Plaintiff paid the required tuition and fees.

253. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

254. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**Count II**
**Fraudulent Inducement/Misrepresentation**
**(Against the Individual Defendants)**

255. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

256. To recover for fraudulent inducement/misrepresentation in Maryland, a plaintiff must prove (1) the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *Sass v. Andrew*, 152 Md. App. 406 (2003).

257. Defendants were aware that Plaintiff requested the meeting on Zoom immediately after receiving the academic misconduct form specifically to discuss the charges and present her defense, as this would be her first opportunity to do so.

258. By scheduling the Zoom meeting, Defendants represented to Plaintiff that they were affording her a meaningful opportunity to defend herself and respond to the allegations.

259. This representation was false. In reality, Defendants used the meeting as an opportunity to gather evidence for their predetermined case against Plaintiff.

260. Defendants knew they had already determined Plaintiff's guilt and finalized sanctions before the meeting with Plaintiff, as evidenced by the completed form dated December 29, 2025.

261. Defendants had the opportunity to inform Plaintiff before the meeting that the academic misconduct forms sent on December 29, 2025, had already completed and finalized the charges and the sanctions. Defendants failed to disclose this material fact.

262. Defendants contacted the Office of Student Conduct regarding recording prior to the meeting. Defendants further failed to inform Plaintiff that the meeting was being recorded or that her statements would be used against her in subsequent proceedings.

263. Defendants' failure to obtain Plaintiff's consent to record the meeting constitutes evidence that their misrepresentation was made with the intent to deceive and defraud Plaintiff during the meeting.

264. Defendants intended to create the appearance of procedural fairness while having already predetermined the outcome, thereby deceiving Plaintiff into believing she had a genuine opportunity to respond to the allegations and defend herself.

265. Defendants manipulated the academic misconduct forms by failing to explicitly state that the final grade was an "F" thereby making the mandated forwarding of the case to the Office of Student Conduct appear unnecessary. This manipulation was designed to induce Plaintiff to sign the forms without fully understanding the severity of the sanctions being imposed.

266. Plaintiff had every right to rely on the meeting as a legitimate opportunity to present her defense and discuss the allegations. She reasonably assumed that Defendants were following JHU's established policies and procedures, and she had no reason to believe the meeting was a sham meeting with a predetermined outcome, given that any evidence of misconduct, a fact-review date, and the final grade were all missing from the academic misconduct form.

267. Had Plaintiff known the truth—that her guilt had already been determined and sanctions finalized—she would never have requested the meeting, much less attended.

268. Under Maryland law, "a promise to do some act or refrain from some act in the future may establish a merely contractual relation, but where it is made with a fraudulent design to induce the promise to do something he would not otherwise have done, it is more than that, it is a misrepresentation of the promisor's state of mind, which may be…a very material thing." *Sass v. Andrew*, 152 Md. App. 406 (2003).

269. As a direct and proximate result of Defendant Kebschull and Defendant Kalhor's misrepresentations, Plaintiff suffered a failing grade in course EN.580.432, an FEV notation on the transcript, and a deferred suspension, which damaged her academic record and transcript.

270. Plaintiff was subjected to biased and unfair hearing processes, during which the Professors were allowed to use evidence from the fraudulent Zoom meeting with Plaintiff.

271. Plaintiff suffered emotional distress, damage to her professional reputation, loss of employment opportunities, and loss of academic credit and advancement as a direct result of Defendant Kebschull and Defendant Kalhor's fraudulent inducement.

272. Plaintiff incurred costs and expenses in defending herself against the false academic misconduct charges, including time spent preparing evidence and documentation to refute the allegations.

273. Defendants' conduct has injured Plaintiff's medical school application process and has caused uncertainty for her future in the medical profession.

274. The fraudulent misconduct proceedings initiated by the Professors have caused ongoing harm to Plaintiff's academic standing, career prospects, and emotional well-being.

**Count III**
**Violation of Maryland Wiretapping Act**
**(Against the Individual Defendants and JHU)**

275. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

276. Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of Maryland's Wiretapping Act shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and shall be entitled to recover actual damages. Md. Code Ann., Cts & Jud, Proc. § 10-410.

277. The Maryland Wiretapping Act is restrictive requiring consent from all parties before a conversation may be taped or otherwise intercepted in the absence of a court order authorizing law enforcement officials to conduct a wiretap.

278. The first time Plaintiff was recorded without her consent, she was in Maryland.

279. The second time Plaintiff was recorded without her consent, she was in Massachusetts, which follows the two-party consent rule, and the Professors were in Maryland.

*i. The Illegal December 11, 2025 Recorded Communication*

280. On December 11, 2025, following the conclusion of Plaintiff's class presentation, Plaintiff left the Zoom session, left the room, and returned to the room when she was called back to the classroom by Defendants.

281. Plaintiff's consent to being recorded expired upon exiting the Zoom session and the room.

282. When Defendants called her back, Plaintiff reasonably believed she was engaging in a private conversation regarding her academic work, project development process, and related matters with Defendants Kalhor and Kebschull.

283. During this private conversation, Defendants kept the Zoom session active and recorded while giving no indication to Plaintiff that she was being recorded.

284. At no time during the December 11, 2025 conversation did Defendants inform Plaintiff that the conversation was being recorded, nor did Plaintiff provide consent.

285. Defendants willfully intercepted Plaintiff's communications through the use of an electronic device, namely Zoom recording software, without Plaintiff's consent and used this illegal interception in the hearings against her.

*ii. <u>The Illegal December 30, 2025 Recorded Communication</u>*

286. The second interception occurred on December 30, 2025, when Plaintiff met with Defendants Kalhor and Kebschull via Zoom to discuss academic misconduct allegations.

287. During this meeting, Plaintiff engaged in private oral communications with Defendants Kalhor and Kebschull, trusting that the Professors had the intention of discussing the allegations against her and that they were giving her a fair chance to respond.

288. Unbeknownst to Plaintiff, Defendants used AI transcription software to record and transcribe Plaintiff's statements without her knowledge or consent.

289. The Office of Student Conduct had explicitly informed Defendants that recordings were prohibited, however Defendants circumvented this prohibition by utilizing an unauthorized AI transcription tool to electronically capture Plaintiff's private communications.

290. These communications were also used in the hearings against her.

*iii. <u>Defendants Kalhor and Kebschull Disclosed Both Communications</u>*

291. Defendants Kalhor and Kebschull disclosed and used the contents of both intercepted communications in the January 7, 2026 hearing and the June 1, 2026 rehearing.

292. Defendants knew or had reason to know that the December 11, 2025 recording and the December 30, 2025 transcript were obtained through interception in violation of Maryland law.

293. The hearing panels in both the January 7, 2026 hearing and the June 1, 2026 rehearing relied upon the illegally intercepted communications as foundational evidence in finding Plaintiff responsible for academic misconduct.

294. The Professor's interceptions were willful and intentional, undertaken for the purpose of gathering evidence against Plaintiff in the academic misconduct proceedings, and Plaintiff suffered harm due to their violation of Maryland's Wiretap Act.

295. There is evidence that Defendants intentionally recorded Plaintiff because they attempted to alter the recorded evidence before presenting it before the hearing panels.

296. Defendants disregarded JHU's own policies prohibiting such recordings, and to conceal the fact that they had, they 1) altered the Zoom recording file of the December 11, 2025 meeting and 2) manually altered the AI transcription from the December 30, 2025 meeting calling the transcription "contemporaneous notes" so they would instead look handwritten.

297. Plaintiff has said there was no indication that either Defendant was taking notes, and there is evidence of AI in the "contemporaneous notes" document.

298. There are alterations evidence that Defendants Kalhor and Kebschull knew what they were doing was prohibited under JHU's policies regarding recording students, and worse, evidence that they sought to get around Maryland's Wiretap Law.

*iv. <u>Defendant JHU Used Both Communications in Adjudication</u>*

299. Since before the first hearing, Plaintiff and her counsel have repeatedly alerted JHU to the Professors' illegal wiretapping actions through legal correspondence, hearing presentations, and appeal letters. There is no doubt that JHU's Office of Student Conduct, hearing panels,

appellate authorities, and administrators were fully aware of these infractions; yet, the panels and appellate authorities fully embraced the illegally obtained evidence in their decision-making.

300. In her September 10, 2026 appeal decision letter, Dean Kavanagh stated that unless JHU's own student handbook explicitly says that "recordings cannot be used as evidence in hearings," JHU is free to use evidence obtained through illegal interceptions. JHU has thus formally placed its internal contracts above state statutory laws.

**Count IV**
**Tortious Interference**
**(Against the Individual Defendants)**

301. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

302. In Maryland, the elements of a claim for tortious interference with a contract are (1) the existence of a contract or a legally protected interest between the plaintiff and the third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract, (4) without justification on the part of the defendant, (5) the subsequent breach by the third party, and (6) damages to the plaintiff resulting from the breach. *Brass Metal Prods., Inc. v. E-J Enters., Inc.,* 189 Md. App. 310, 348 (2009).

303. It is well established law in Maryland that "A man who induced one of two parties to a contract to break it, intending thereby to injure the other or to obtain a benefit for himself, does the other an actionable wrong." *Gore v. Condon,* 87 Md. 368, 376, 39A. 1042 (1898)

304. At all relevant times, a contractual relationship existed between Plaintiff and JHU by virtue of Plaintiff's enrollment at the University, she paid the required tuition and administrative

fees, received JHU's policies and procedures, and complied with the terms and academic requirements prescribed by JHU in order to obtain her degree.

305. Defendants Kalhor and Kebschull taught the JHU course EN.580.432 in Fall 2025 in which Plaintiff was enrolled. They directly supervised her academic work, scheduled project check-ins, and provided feedback for the course project.

306. Defendants actively evaluated Plaintiff's performance and selected academic sanctions to lower her final course grade by two letter grades, prepared evidence, attended, and delivered structured presentations to the JHU hearings, both of which were official proceedings conducted under the Policy.

307. Defendants were actively and routinely engaged in the process, and without a doubt were aware that JHU had a valid contract with Plaintiff.

308. Had it not been for Defendants' intentional inducement, JHU would not have breached its contract with Plaintiff.

309. Defendants fabricated and manufactured evidence, which the hearing boards relied upon when finding Plaintiff guilty of academic misconduct.

310. Due to the Board's decision, the University delayed in conferring Plaintiff's earned diploma, as the decision rendered JHU impossible to perform.

311. Defendants have no valid justification for their actions, as some of their actions were illegal and violated Maryland's Wiretap Act.

312. When Defendants caused JHU to breach their contract with Plaintiff, Plaintiff suffered economical, reputational, and emotional harm.

313. The Professors intentionally interfered with JHU's contract with Plaintiff when they fabricated evidence, illegally obtained and used illegal wiretap evidence, and manufactured a record against Plaintiff in the proceedings which they knew the hearing boards would rely upon.

314. Defendants, who were in a position of authority over Plaintiff, abused that authority when they broke JHU's rules of procedure regarding academic misconduct, and misled the hearing boards.

315. Due to Defendants Kalhor and Kebschull's interference, JHU breached its valid contract with Plaintiff by withholding her earned diploma, breached its procedures, and punished Plaintiff with harsh sanctions.

**Count V**
**Negligence**
**(Against JHU)**

316. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

317. To establish a claim for negligence under Maryland law, a plaintiff must prove four elements: (1) that the defendant was under a duty to protect the plaintiff from injury; (2) that the defendant breached that duty; (3) that the plaintiff suffered actual injury or loss; and (4) that the loss or injury proximately resulted from the defendant's breach of that duty. *Sterling v. Johns Hopkins Hosp.*, 145 Md. App. 161 (2002).

318. At all relevant times, Defendant JHU owed Plaintiff a duty to exercise reasonable care for her safety, academic welfare, and procedural fairness as a student enrolled in its biomedical engineering program.

319. Defendant JHU breached its duty of care to Plaintiff through the actions and omissions of its employees, agents, and representatives including but not limited to:

a. Failing to adequately supervise Defendants Kalhor and Kebschull in their conduct of the Class and their handling of academic misconduct allegations against Plaintiff;

b. Failing to ensure that faculty members complied with the Homewood Undergraduate Academic Ethics Policy's requirement to promptly review allegations with students before filing formal charges;

c. Allowing faculty members to manufacture, fabricate, and manipulate evidence presented in official university proceedings without institutional oversight or verification;

d. Permitting the admittance of evidence illegally obtained in the hearings;

e. Failing to provide adequate notice and preparation time for the first administrative hearing, thereby denying Plaintiff an opportunity to defend herself;

f. Allowing unequal treatment of the parties during the hearing process;

g. Failing to ensure that the hearing panels exercised due diligence in evaluating evidence and failing to strike fabricated and illegally obtained materials from the record;

h. Failing to timely confer Plaintiff's earned degree.

320. Defendant JHU is vicariously liable for the negligent and wrongful acts of Defendants Kalhor and Kebschull who were employees of JHU.

321. As a direct and proximate result of JHU's negligence, Plaintiff has suffered and continues to suffer from actual injury and loss.

322. The harm suffered by Plaintiff was a probable and foreseeable consequence of JHU's breach to enforce its policies, adequately supervise its faculty, and offer Plaintiff a procedurally fair investigation and appeals process.

**Count VI**
**Constructive Fraud**
**(Against JHU)**

323. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

324. Maryland recognizes constructive fraud when a defendant breaches a legal or equitable duty in a way the law treats as fraudulent because it tends to deceive, violate confidence, or injure public interests, and plaintiff need not prove actual intent to deceive. *Md. Envtl. Trust. V. Graynor*, 370 Md. 89 (2002). Constructive fraud typically arises from a breach of duty where a relationship of trust and confidence exists, and a party is justified in believing that the other party will not act in a manner adverse or inconsistent with the reposing party's interest or welfare, and a violation of this belief occurs. *Crawford v. Mindel*, 57 Md. App. 111 (1984).

325. Defendant JHU assumed and abused a position of trust and procedural control as it had a duty arising from the faculty-student disciplinary relationship created by JHU's own Academic Ethics Policy, and Defendants Kalhor and Kebschull had control over the course and misconduct process.

326. This control matters because Maryland recognizes confidential relationships where confidence is reposed on one side and superiority or influence exists on the other. *See Travel Comm., Inc. v. Pan Am World Airways, Inc.*, 91 Md. App. 123 (1992) ("The relation and duties involved in it need not be legal; it may be moral, social, domestic, or merely personal.")

327. Plaintiff reasonably placed trust in Defendants to follow JHU's stated procedures, to disclose the nature of the allegations, and to provide the promised opportunity to respond before finalizing sanctions.

328. Defendants used a relationship of trust and procedural dependance to create the appearance of a fair review while using Plaintiff's reliance on that process to gather and present evidence against her, violating private trust.

329. Here, the deceptive tendency is shown by the mismatch between what JHU claimed the process should be and what Defendants actually did, breaching that process.

330. Plaintiff can plausibly allege constructive fraud because Defendants were not strangers or ordinary adversaries; they were her instructors, evaluators, and gatekeepers to the academic-ethics process.

331. JHU controlled the timing, evidence, grade sanction, hearing presentation, and Plaintiff's opportunity to meaningfully respond to the allegations.

332. Plaintiff reasonably depended on JHU and her instructors to follow JHU's mandatory procedures and to conduct the required fact review before finalizing sanctions. Instead, Defendants created the appearance of procedural fairness while seemingly concealing that sanctions had already been determined, using Plaintiff's defensive statements as evidence against her, and presenting manufactured, altered, unauthenticated, or misleading evidence to the panels.

333. This is the type of breach of equitable duty and private confidence that can support constructive fraud. Due to this deceptiveness, Plaintiff received a failing grade, a transcript notation, deferred suspension, delayed diploma, disrupted employment, additional semester costs, delayed medical-school applications, reputational harm, and emotional distress.

**Count VII**
**Defamation**
**(Against the Individual Defendants)**

334. Under Maryland law, to present a prima facie case of defamation, a plaintiff must establish (1) that the defendant made a defamatory statement to a third person; (2) that the statement was false; (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm. *Offen v. Brenner*, 402 MD. 191 (2007).

335. A defamatory statement is defined as one "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Offen v. Brenner*, 402 MD. 191 (2007).

336. Statements made during a university proceeding can satisfy the publication requirement when a false statement is communicated to committee members or university officials and defamation claims may proceed if the plaintiff can show that statements were made with malice or in bad faith. *Khan v. Yale Univ.,* 347 Conn. 1 (2023).

337. Here, Defendants Kalhor and Kebschull have a sustained course of conduct showing that they knew their accusations of cheating, plagiarism, and dishonesty were false.

338. Defendants predetermined Plaintiff's guilt before affording her any meaningful opportunity to respond and manufactured the very evidence on which the defamatory accusations rested.

339. Defendants continued to advance the plagiarism narrative after Plaintiff exposed manipulation. Continuing to publish accusations after being confronted with objective contradictory evidence is evidence of reckless disregard for the truth.

340. Defendants Kalhor and Kebschull and the Board disregarded Plaintiff's evidence, even metadata and timestamped documentation. This supports actual malice because Defendants had obvious reasons to distrust the accusation and still failed to consider it.

341. At the rehearing, Professor Kalhor admitted the faculty had authority to request authenticated, user-linked access logs from JHU's IT department, but he "deemed it unnecessary." Publishing a grave accusation based on anonymous access data while declining available definitive records is not simple negligence, but reckless disregard for whether the accusation was true.

342. At the rehearing, Professor Kalhor stated that Plaintiff' performance on the 60% of coursework outside the project showed she did not grasp the material, even though Plaintiff had scored in the A-range on that material and the December 30 transcript reflected Professor Kebschull's statement that Plaintiff "would have been fine in the class otherwise". A knowingly

false statement about Plaintiff's academic competence supports actual malice because it shows Defendants were willing to distort objective facts to secure a finding that Plaintiff cheated.

343. Taken together, these allegations show a pattern of actual malice which defeats any claimed qualified privilege and therefore, Plaintiff has grounds to bring a defamation claim.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff Jane Doe prays for the following relief:

(1) On the first cause of action for a breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, injunctive relief, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(2) On the second cause of action for fraudulent inducement/misrepresentation, a judgment awarding Plaintiff in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, punitive damages, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(3) On the third cause of action for civil wiretapping, a judgment awarding Plaintiff in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, punitive damages attached to Defendants' malice, willfulness and reckless disregard for Plaintiff's statutory rights under Maryland law, attorneys' fees, expenses, costs and disbursements;

(4) On the fourth cause of action for tortious interference of a contract, a judgment awarding Plaintiff in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, injunctive relief and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(5) On the fifth cause of action for negligence, a judgment awarding Plaintiff in an amount to be determined at trial, including, without limitation, damages to physical well-

being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, injunctive relief, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(6) On the sixth cause of action for constructive fraud, a judgment awarding Plaintiff in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(7) On the seventh cause of action for defamation, a judgment awarding Plaintiff in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and;

(8) Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all triable issues in the present matter.

**Dated:** September 28, 2026

**Respectfully submitted,**

**SMITHEY LAW GROUP LLC**

*/s/ David M. E. Moon*
David M. E. Moon, Esq. (20407)
Timothy M. Hartman, Esq. (31422)
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
(410) 919-2990 (Telephone)
(410) 280-1602 (Facsimile)
david.moon@smitheylaw.com
timothy.hartman@smitheylaw.com
*Counsel for Plaintiff*

**NESENOFF & MILTENBERG, LLP**

Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Tara J. Davis, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500 (telephone)
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
tdavis@nmllplaw.com
(*pro hac vice* forthcoming)